**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**HUGH and CHERYL BOHRER,**
**as Parent and Legal Guardian**
**for M.G., a Minor,**

Plaintiffs,

**v.**                                                    **Civil Action No. 3:08-CV-144**
                                                         **(BAILEY)**

**CITY HOSPITAL, INC., and**
**UNITED STATES OF AMERICA,**

Defendants.

### <u>ORDER GRANTING UNITED STATES' MOTION TO DISMISS</u>

The above-styled matter is currently before the Court on defendant United States'

Renewed Motion to Dismiss for Lack of Jurisdiction [Doc. 101] and Memorandum in

Support [Doc. 102]; plaintiffs' Response in Opposition to United States' Motion to Dismiss

[Doc. 123] and Memorandum in Opposition [Doc. 124]; defendant United States'

Supplement to its Motion to Dismiss [Doc. 150]; plaintiffs' Supplementary Response in

Opposition to United States' Motion to Dismiss [Doc. 171] and Memorandum in Opposition

[Doc. 173]; and defendant's Reply [Doc. 185].  The Court has reviewed the record and the

arguments of the parties, and for the reasons set out below finds that defendant United

States' Renewed Motion to Dismiss for Lack of Jurisdiction [Doc. 101] should be

**GRANTED**.

## I.    **BACKGROUND**

Plaintiffs, Hugh and Cheryl Bohrer, are the legal guardian of M.G.  Hugh and Cheryl Bohrer were substituted as plaintiffs for M.G.'s mother, Shannon Gregg on September 3, 2009. [Doc. 117].  Ms. Gregg first filed a Complaint on her own behalf and that of M.G. on May 27, 2003, alleging that M.G. suffered injuries at birth as a result of negligence on the part of Shenandoah Valley Medical Systems, Inc., Shenandoah Maternity Center, H. Alexander Wanger, M.D., Lori Goforth, C.N.M., and City Hospital, Inc. The birth of M.G. took place on November 14, 2000.  Following M.G.'s  birth by Caesarian section, the Complaint alleges that he had "multiple myoclonic episodes as well as tonic-clonic episodes which resulted in brain damage, developmental delay and reflux." [Doc. 1].

On July 8, 2003, the United States substituted itself as the party defendant for Shenandoah Valley Medical Systems, Inc., Shenandoah Maternity Center, ("Shenandoah"), H. Alexander Wanger, M.D., and Lori Goforth, C.N.M., and accordingly filed a Notice of Removal to Federal District Court for the Northern District of West Virginia. The Notice of Substitution and Notice of Removal were based upon the fact that the United States Department of Health and Human Services deemed Shenandoah eligible for coverage under the Federal Tort Claims Act, 28 U.S.C. § 1346, 2671 et seq., ("FTCA"), as Shenandoah was an entity receiving federal grant money from the United States Public Health Service pursuant to 42 U.S.C. §§ 254(b) or 254(c).

Subsequent to the Removal, on August 19, 2003, the Defendant United States filed a Motion to Dismiss the Complaint based upon lack of subject matter jurisdiction as plaintiff had failed to present for consideration an administrative claim to the appropriate federal agency as is required by 28 U.S.C. § 2675(a).  That Motion was opposed by plaintiff and

following the submission of Memoranda on both sides, Judge W. Craig Broadwater entered an Order granting the United States' Motion to Dismiss on March 9, 2004.

On September 14, 2004, plaintiff filed an Administrative Tort Claim, approximately 189 days following the dismissal of her case in Federal District Court pursuant to the terms of the FTCA.

On September 22, 2008, plaintiffs filed suit in the Northern District of West Virginia alleging medical malpractice. [Doc. 1]. On January 29, 2009, the United States filed a Motion to Dismiss for Lack of Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) on the basis of the statute of limitations. [Doc. 31]. On April 28, 2009, this Court denied the United States' motion as premature and allowed discovery to continue on the issue of plaintiffs' knowledge. [Doc. 57].

On August 19, 2009, the United States filed a Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. 101]. In the motion, the United States argued that based on the deposition testimony of Ms. Gregg, as well as the expert opinion of Pediatric Neurologist Robert Clancy, M.D. ("Dr. Clancy"), it is clear plaintiffs knew or should have known of M.G's injuries shortly after his birth. Thus, the United States argued plaintiffs' claims are barred by the statute of limitations pursuant to 28 U.S.C. § 2401(B). [Doc. 102]. On September 1, 2009, plaintiffs filed a response, arguing defendant's motion was premature and requesting that the Court allow discovery to close before entertaining a motion to dismiss based on factual determinations. [Doc. 114]. Plaintiffs also substantively responded, arguing: (1) M.G.'s "injuries" were unknown or unknowable prior to September 14, 2002, because "it would have been totally impossible to predict the injuries M.G. would ultimately suffer at the time of M.G.'s birth" ([Doc. 124] at 8); (2) the United States

misconstrued the deposition testimony of Ms. Gregg and that she did not know, nor should she have known, of both an injury to M.G. and its cause prior to September 14, 2004 (Id. at 10); (3) the expert opinion of Dr. Clancy does not warrant "summary judgement" (Id. at 14); (4) the statements of plaintiffs' experts preclude summary judgment (Id. at 17); and (5) that this Court should equitably toll the statute of limitations (Id. at 18).

On September 10, 2009, this Court granted plaintiffs until November 10, 2009, to file a supplementary response to the United States' Renewed Motion to Dismiss. (See [Doc. 127]). The Court also allowed the United States to supplement its motion on or before October 27, 2009. [Doc. 127].

On October 27, 2009, the United States filed a supplemental memorandum [Doc. 150]. In the Supplement, the United States argued: (1) the expert reports submitted by plaintiffs are consistent with the findings of Dr. Clancy ([Doc. 150] at 1); (2) equitable tolling does not apply in the above-styled case (Id. at 7); and (3) it is plaintiffs' burden to timely identify the proper defendant (Id. at 11).

On November 6, 2009, this Court granted plaintiffs an additional extension until November 13, 2009, to file a supplementary response. [Doc. 159]. On November 13, 2009, plaintiffs filed a Supplementary Response in Opposition to the United States' Motion to Dismiss [Doc. 171]. In the Motion, plaintiffs argue that M.G.'s injuries did not manifest until January of 2003 at the earliest; that if the Court finds the injuries manifested prior to January 2003, the Court should equitably toll the statute of limitations; and finally, plaintiffs ask that this Court find–contrary to the authority of this Circuit–that plaintiffs' claim did not accrue until plaintiffs had reason to know of the Government's causal connection to the claim. [Doc. 171]. On November 24, 2009, the United States filed its Reply [Doc. 185].

## II.  **FACTS**

On November 13, 2000, Shannon Gregg presented to City Hospital in Martinsburg, West Virginia.  ([Doc. 173] at 1).  Ms. Gregg had a history of birth by Caesarean section, and had been informed that she could deliver her second child by vaginal delivery, commonly referred to as Vaginal Birth After C-section or "VBAC."  (Id.)  While at City Hospital, Ms. Gregg was under the care of Nurse Midwife Lori Goforth, C.N.M., and Alexander Wanger, M.D.  (Id.)  Nurse Goforth and Dr. Wanger induced labor, and on November 14, 2000 complications arose.  (Id.)  An emergency C-section was performed by Dr. Wanger at 12:30 a.m. on November 14, 2000.  ([Doc. 173] at 1).  During the C-section it was discovered that the uterus had ruptured and that M.G. and the placenta were in the peritoneal cavity.  (Id.)

M.G. was born on November 14, 2000 and taken to Johns Hopkins Hospital for evaluation.  ([Doc. 173] at 1). On November 25, 2000, M.G. was discharged to the care of Ms. Gregg.  (Id.)  M.G.'s discharge summary instructed: "Follow neurological status." ([Doc. 176] at 7000A-7002A).  The summary also noted: "An EEG was performed on 11/14/2000 which showed no burst suppression, no seizures.  Brain CT without contrast on 11/14/2000 showed no intracranial mass.  No midline shift.  No evidence of hydrocephalus.  (Id.)

Following the discharge of M.G. from Johns Hopkins Hospital, M.G. was taken into the care of pediatrician Andrew Berens, M.D.  ([Doc. 173] at 2).  On or about November 28, 2000, M.G. was first seen by Dr. Berens, who noted:

> Child is at notable risk for feto-anoxic brain injury, and although
> no further seizures seen, there does appear to be some clonic-
> type activity, very subtle in quality.  Apparently is going to

follow up with pediatric neurologist at Johns Hopkins in 1-2 months. After that point, we'll probably refer him to pediatric neurology in Martinsburg. Discussed with mom the possibilities of development of neurological complications. She's aware of it. Advised that some of these conditions may not show up until his development progresses, but needs to be watching for further recurrence of neonatal seizure activity.... We'll follow this closely, once a week. Call me if there is any change.

([Doc. 176] at 7003A). On or about December 21, 2000, Dr. Berens noted: "Perinatal seizures without recurrence but suspected hypoxic brain injury." (Id. at 7004A).

On April 19, 2001, when M.G. was five months old, an "Occupational Therapy Initial Evaluation" was performed by Occupational Therapist Leslie Bowman. ([Doc. 176] at 7008A). The evaluation states:

Currently, [M.G.] is functioning at the following levels:

Fine Motor

| | |
|---|---|
| Visual tracking | Age appropriate |
| Grasp/ Prehension | 2-3 months |
| Reach | 2-4 months |
| Release | 0-2 months |
| Bilateral skills | 1-3.5 months |

...

Areas to Address

1.     Parent education.

2.     Developmental delay.

3.     Reflux type behaviors.

(Id. at 7009A-7010A). Following this evaluation, on or about May 11, 2001, Dr. Berens noted "Developmental delay- continuing referral to Dr. Ingold, in pediatric neurology.

Concerned about effused anterior fontanelle at his stage." (Id. at 7012A).

On July 17, 2001, when M.G. was 8 months old, M.G. was evaluated by Monique K. Gingold, M.D. to determine if he needed to enter a special needs program. ([Doc. 173] at 3; [Doc. 176] at 7015A-7018A). The evaluation states in part:

> In summary, this young man, with a very complicated neonatal course, is doing extremely well. I am very impressed by the fact that his head circumference is normal and he no longer has the cortical thumbing. He is still significantly delayed and on the Denver Developmental Assessment, is at around six months throughout. Nevertheless, this does represent a significant improvement from the last visit. And as I explained to the mother, it is impossible totally to predict what he will be doing...

(Id. at 7017A). The nursing notes from this visit state: "Mom states he has brain damage that was caused from the delivery." (Id. at 7016A). Additionally, the notes of the social worker state: "Patient here for developmental delay evaluation. There was problems [sic] at delivery with the child, and the child had brain damage, as indicated by the mother." (Id. at 7017A).

On or about September 6, 2001, Dr. Margret Jaynes, pediatric neurologist, evaluated M.G. per a referral of Dr. Berens. ([176] at 7020A, 7021A-7023A). She states in her letter to Dr. Berens: "It does appear that [M.G.] has suffered some neurological insult, although further investigation is required in order to properly characterize it. We would like to request that you send copies of his records, both from your office as well as any you have from Johns Hopkins to us in the pediatric neurology clinic." (Id. at 7023A). On September 26, 2001, Dr. Berens noted: "Apparent learning disability with prenatal brain

damage. Seeing Dr. Jaynes.... Possible learning disability with history of perinatal brain damage- continue to follow with Dr. Jaynes, pediatric neurology. Apparently she feels that his deficits may be mild as he grows." (Id. at 7019A, 7020A (noting referral for perinatal brain damage)).

In November 2002, M.G. was diagnosed with cerebral palsy. ([Doc. 176] at 7051A-57A). Additionally, in January of 2003, M.G. received a state disability determination from the West Virginia Disability Determination Service by Harry Hood, M.S. (Id. at 7053A-57A). In the evaluation paperwork it states that M.G. is applying for disability because "He has cerebral palsy, brain damage involving the myelin not developing and developmental delays." (Id. at 7053A-52A). The "onset" of his disability is listed as "Birth." (Id. at 7054A)

## III.    CONCLUSIONS OF LAW AND CITATION TO AUTHORITY

### A.    Standard of Review

The United States is asking the Court to dismiss the above-styled action on the basis of a lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) because plaintiffs failed to file their claims within the appropriate statute of limitations. [Doc. 101]. In order to determine the appropriate standard of review, the Court must first determine whether compliance with the FTCA's statute of limitations is a jurisdictional prerequisite to bringing a suit or an affirmative defense to the action.

Federal Courts have jurisdiction over claims against the United States, only to such extent that the United States has waived its sovereign immunity. "The terms of [the United States'] consent to be sued in any court define the court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Thus it appears that the statute of limitations would be a term of the United States' consent to be sued, and be a

jurisdictional prerequisite.  Some Courts questioned this logic, however, when the United States Supreme Court applied equitable tolling to a claim brought under the FTCA in *Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89, 93-96 (1990).  *Id.*  The Court in *Irwin* stated: "[o]nce Congress has made such a waiver [of its sovereign immunity], we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that is applicable to private suits, amounts to little, if any, broadening of the congressional waiver."  *Id.* at 95.

Some Courts interpreted *Irwin* to stand for the proposition that compliance with the statute of limitations is not a jurisdictional prerequisite because in order for a court to have jurisdiction to toll the statute of limitations, the court must first have jurisdiction to entertain the case.  *See T.L. v. United States*, 443 F.3d 956, 960 (8th Cir. 2006) (discussing this finding, but holding that the statute of limitations is a jurisdictional prerequisite); *Santos v. United States*, 559 F.3d 189, 194 (3d Cir. 2009) (holding based in part on *Irwin* that the FTCA statute of limitations is not a jurisdictional prerequisite).  Subsequent to *Irwin*, however, the Supreme Court in *United States v. Brockamp*, 519 U.S. 347 (1997), held that the availability of equitable tolling in cases where the United States has waived its sovereign immunity is dependent on congressional intent, and the Court found that Congress had not authorized tolling in cases concerning tax refund claims.  Thus, the conclusion of the Eighth Circuit in *T.L.,* was that the Court's holding in *Irwin*– that equitable tolling is available in FTCA cases–was not a finding that compliance with the statute of limitations was non-jurisdictional, but instead was based on a determination that Congress intended for equitable tolling to apply in FTCA cases.  *T.L.*, 443 F.3d at 960.  As such, the Court in *T.L.* found equitable tolling is a 'term' of the United States' sovereign immunity

waiver. *Id.*

The result of the above analysis is that it is consistent to find both: (1) that compliance with the statute of limitations is a jurisdictional prerequisite to federal jurisdiction under the FTCA; and (2) that equitable tolling may apply in FTCA cases. Thus, in order for a court to determine if it has jurisdiction to entertain the claim pursuant to the *T.L.* analysis, the Court must determine both whether plaintiff filed an administrative claim within the statute of limitations, and if plaintiff did not comply, whether equitable tolling applies.

This Court notes that the Fourth Circuit has stated that failure to comply with the statute of limitations in FTCA cases is jurisdictional, but that the Fourth Circuit has not engaged in any extensive analysis of the issue. *See **Kokotis v. United States Postal Service***, 223 F.3d 275, 278 (4th Cir. 2000) (finding that plaintiff's failure to "request a sum certain within the statute of limitations deprives a district court of jurisdiction over any subsequently filed FTCA suit."); *see also **Hahn v. United States***, 2008 WL 4809240 *1, *2 (4th Cir. Nov. 5, 2008) (noting "Congress further prescribed a statute of limitations that operates as a jurisdictional prerequisite to a suit under the FTCA, 28 U.S.C. § 2401(b).") (citing **Gould v. U.S. Dep't of Health & Human Servs.**, 905 F.2d 738, 745-46 (4th Cir. 1990) (en banc)); **Kelly v. United States**, 1993 WL 321581 *1 ("[t]he two-year limitations period is jurisdictional and therefore may be raised by the parties at any stage of the litigation, or by the court on its own motion; it is not subject to waiver")*; see also **Kinson v. United States***, 322 F.Supp.2d 684, 685 (E.D.Va. 2004) (dismissing FTCA claim pursuant to 12(b)(1) for failure to file within required statute of limitations), ***Ahmed v. United States***, 1993 WL 726255 *1, *4 (D.Md. July 28, 1993) (same); *but see **Thorn v. Jefferson-Pilot Life Ins. Co.***, 445 F.3d 311, 322 n.11 (4th Cir. 2006) (stating, "It is by no

means settled that Jefferson-Pilot bears the burden of proving its statute of limitations defense... We have never decided the issue, although we have held that an FTCA plaintiff bears the burden of showing at least one element of constructive knowledge for accrual purposes. *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 745-46 (4th Cir. 1990) (en banc) ('The burden is on the plaintiffs to show that due diligence was exercised and that critical information, reasonable investigation notwithstanding, was undiscoverable.')").

Based on the above reasoning, this Court finds that compliance with the FTCA statute of limitations is a jurisdictional prerequisite. The United States' motion, therefore, should be evaluated pursuant to the standard set out in Federal Rule of Civil Procedure 12(b)(1). *Materson v. Stokes*, 166 F.R.D. 368, 370-71 (E.D.Va. 1996) ("Plaintiff Materson carries the burden of proving that federal subject matter jurisdiction is proper. As the party asserting jurisdiction, he continues to shoulder this burden where Defendants object to a federal district court's assertion of jurisdiction."); *Pifer v. United States*, 903 F.Supp. 971, 972 (N.D. W.V. 1995) ("Plaintiff having brought this action pursuant to the FTCA, bears the burden of persuasion because a party who sues the United States bears the burden of identifying an unequivocal wavier of sovereign immunity.") (citing *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995); *Int'l Longshoremen's Ass'n, Steamship Clerks Local 1624, AFL-CIO v. Va. Int'l Terminals*, 914 F.Supp. 1335, 1338 (E.D.Va. 1996) ("[w]ith regard to [defendant's] 12(b)(1) motion challenging jurisdiction, the burden is on plaintiffs, as the party asserting jurisdiction to prove that federal jurisdiction is proper").

A motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure may attack subject matter jurisdiction in two

different ways.  First, a Rule 12(b)(1) motion may attack the complaint on its face, asserting simply that the complaint 'fails to allege facts upon which subject matter may be based.' *Adams* [*v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)].  If such is the case 'the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the some procedural protection as he would receive under a Rule 12(b)(6) consideration.' *Id.*

On the other hand, a Rule 12(b)(1) motion may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings."  *Mortensen v. Fed. Fist Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *see Adams*, 697 F.2d at 1219.

*Int'l Longshoremen's Ass'n, Steamship Clerks Local 1624, AFL-CIO*, 914 F.Supp. at 1338.

Here, the United States has presented a factual challenge to the basis of jurisdiction: that plaintiffs knew or should have known of the injury to M.G. and its cause prior to September 14, 2002.  (See [Doc. 101]).  When a defendant files a 12(b)(1) motion challenging the factual basis of subject matter jurisdiction, the plaintiff "has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999); *DuPont v. United States*, 980 F.Supp. 192, 194 (S.D.W.Va.1997) (citing *Fredericksburg & Potomac Railroad Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).  In a 12(b)(1) motion, a trial court's jurisdiction, "its very power to hear the case," *Mortensen*, 549 F.2d at 891, is at issue.  In considering a motion to dismiss pursuant to Rule 12(b)(1), a court should "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding

to one for summary judgment." *Evans*, 166 F.3d at 647 (internal citation omitted); *DuPont*, 980 F.Supp. at 194 (quoting *Fredericksburg & Potomac Railroad Co.*, 945 F.2d at 768).

"Unlike the procedure in a Rule 12(b)(6) motion, in which the fact finder is presumed to retain the truth-finding role, a court considering a Rule 12(b)(1) motion may weigh the evidence to determine whether it has subject matter jurisdiction." *DuPont*, 980 F.Supp. at 194 (citing *Adams*, 697 F.2d at 1219). "In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." *Mortensen*, 549 F.2d at 891. The moving party's motion to dismiss should be granted when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647.

Based on the discussion above, this Court finds that the United States' motion is properly construed as a 12(b)(1) motion to dismiss for lack or jurisdiction, and accordingly this court will "weigh the evidence to determine whether [this Court] has subject matter jurisdiction." *DuPont*, 980 F.Supp. at 194 (citing *Adams*, 697 F.2d at 1219). The United States' motion to dismiss will be granted if "the material jurisdictional facts are not in dispute and the [United States] is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647.

B.      Filing Date of Plaintiffs' Administrative Claim

On September 22, 2008, plaintiffs filed a medical malpractice claim pursuant to the Federal Tort Claims Act. [Doc. 1]. The limitation for filing a tort claim against the United States is set forth in 28 U.S.C. § 2401(b): "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two

years after such claim accrues..." The Federal Tort Claims Act ("FTCA") also has a savings provision, 28 U.S.C. § 2679(d)(5), which provides that an untimely filed action "shall be deemed to be timely presented under Section 2401(b) of this Title if- (A)The claim would have been timely filed on the date the underlying civil action was commenced, and (B) The claim is presented to the appropriate federal agency within sixty days after dismissal of the civil action." 28 U.S.C. § 2679(d)(5). Thus, the Court must first determine what is the relevant filing date of plaintiffs' claim, and then work backward from that date to determine if plaintiffs knew or should have known of the injury to M.G. and its cause two years prior to the filing of an administrative claim pursuant to the FTCA. *See* ***United States v. Kubrick***, 44 U.S. 111, 123 (1979).

Plaintiffs filed an administrative tort claim on September 14, 2004. Prior to filing that claim, however, plaintiffs[1] had filed an underlying state civil case on May 23, 2003. The state case was dismissed on March 9, 2004. Had plaintiffs filed an administrative claim within 60 days of the dismissal of the state case, the administrative claim would relate back to the filing date of the state civil action pursuant to the savings clause in 28 U.S.C. § 2679(d)(5). Plaintiffs did not, however, file an administrative claim until September 14, 2004–more than 60 days after the dismissal of the state action. Thus, as plaintiffs failed to meet the savings provisions of 28 U.S.C. § 2679(d)(5), the relevant date for purposes of the statute of limitations is September 14, 2004.

---

[1] As noted above, Hugh and Cheryl Bohrer, are the legal guardians of M.G. They were substituted as plaintiffs for M.G.'s mother, Shannon Gregg on September 3, 2009. [Doc. 117]. Ms. Gregg initially filed the instant action on behalf of M.G. Ms. Gregg also filed the previous state case, and the administrative claim on behalf of M.G.

C.    When Did Plaintiffs' Claim Accrue?

In order to determine if this Court has jurisdiction to entertain plaintiffs' claim, this Court must next work backwards from September 14, 2004, and determine if plaintiffs knew or should have known of both the injury to M.G. and its cause, more than two years prior to September 14, 2004.  *See  United States v. Kubrick*, 44 U.S. 111, 123 (1979).  This is where the parties disagree[2].

The Supreme Court in **United States v. Kubrick**, 44 U.S. 111, 123 (1979), set forth the "discovery rule" which states that a tort claim accrues when the plaintiff is aware of both the existence and cause of his injury.  Here, there is no dispute that M.G. is injured, and that the injury occurred at birth.  There is, however, much disagreement regarding when plaintiffs knew or should have known of the injury to M.G.

1.    Discovery of the Injury

Plaintiffs argue that M.G.'s injury could not have been known prior to November of 2002, because cerebral palsy cannot be diagnosed prior to two years of age. (See e.g. [Doc. 173] at 6, 22).  This argument, while appearing to address the issue of knowledge–is actually an argument addressing what constitutes M.G.'s injury.  If M.G's injury is cerebral palsy, and if cerebral palsy can only be diagnosed at two years of age, then plaintiffs' claim was timely filed (two years from the date of the manifestation of the injury would be September of 2004 which is when M.G.'s administrative claim was filed).  Despite the fact that this Court has found several cases where infants under two years of age were

_____

[2]  The Court notes that plaintiffs concede that tolling due to M.G.'s minority is unavailable. ([Doc. 53] at 2)

diagnosed with cerebral palsy[3], when it is possible for a doctor to diagnose cerebral palsy is irrelevant to this Court's inquiry. This is because the FTCA inquires as to *injury*–not as to diagnosis or full extent of injury. "To be aware of an injury, a plaintiff need not know the full extent of his or her injury. The limitations period will run even though the ultimate damage is unknown or unpredictable." **Rice v. United States**, 889 F.Supp. 1466, 1470 (N.D.Okla. 1995) (citing **Robbins v. United States**, 624 F.2d 971, 973 (10th Cir. 1980)). The Eighth Circuit has addressed this argument, specifically with regard to cerebral palsy, stating:

> Cerebral palsy is 'a disability resulting from damage to the brain before, during or shortly after birth, and outwardly manifested by muscular incoordination and speech disturbances.' *Merriam-Webster's Medical Desk Dictionary*, 129 (Reb.Ed. 2005). The accrual of a claim based on brain injury at birth is not tolled merely because the injury worsens and develops into cerebral palsy.

**Ingram v. United States**, 443 F.3d 956, 962 (8th Cir. 2006); See *e.g.* **Gordon v. United States**, 1992 WL 144697 *1, *3 (9th Cir. 1992) (reversing on statute of limitations grounds,

---

[3] *See e.g.* **Herrera-Diaz v. United States**, 845 F.2d 1534, 1535 (9th Cir. 1988) (diagnosis of cerebral palsy due to lack of oxygen at birth at six months of age); **Johnson v. United States**, 2005 WL 1605822 (W.D.Tex. June 30, 2005) (finding that mother of plaintiff certainly knew of injury, when plaintiff was 12 months of age because she given a diagnosis of cerebral palsy at that time). The Court notes that **Johnson**, which found knowledge of injury when plaintiff received a *diagnosis* of cerebral palsy is distinguishable from the case at bar because the diagnosis was six years prior to the filing of plaintiff's claim. Thus, the court in **Johnson** had no need to determine the exact date that plaintiff knew of the injury to find that plaintiff failed to comply with the statute of limitations.

finding that it was clear error for the district court to find plaintiff should not have known of injury and cause within the two year statute of limitations where plaintiff was eventually diagnosed with cerebral palsy, but where mother of plaintiff knew shortly after birth that plaintiff had "breathing problems caused by meconium aspiration"; at three months doctors told her they were concerned by plaintiff's slow head growth; and within six months she knew he was developmentally delayed and that the cause was stress at birth). Were this Court to accept plaintiffs' proposition that plaintiffs did not know of the "injury" to M.G. until such time as plaintiffs knew the "extent of injuries suffered by M.G." (Doc. 176-4 ¶ 7), it would make the statute of limitations meaningless.

Plaintiffs' argument that the claim did not accrue until Ms. Gregg was provided a diagnosis of cerebral palsy is based on the logic that until she knew the extent of M.G.'s injuries she could not state her damages with specificity. (See e.g. [Doc. 173] at 8). While at first glance such a claim seems compelling, the possible results of such a rule would run afoul of the very problems the FTCA statute of limitations seeks to prevent. *See Goodhand v. United States*, 40 F.3d 209, 212 (7th Cir. 1994). The Seventh Circuit in *Goodhand* examined this precise question, stating: "[o]ur analysis has to be qualified in two respects. The first concerns the severity of the injury. The statute of limitations begins to run upon the discovery of the injury, even if the full extent of the injury is not discovered until much later." *Id.* Should the statute of limitations not be so construed, the Court observed: "the statute of limitations might be extended indefinitely-perhaps even to death, since until then it is always possible that the Plaintiff's injury will worsen." *Id.* This Court, is likewise unwilling to construe the FTCA to allow for such an absurd result.–especially in light of the possible availability of equitable tolling in FTCA cases. *See Irwin v. Dep't of*

*Veteran Affairs*, 498 U.S. at 93-96. Thus, this Court finds that plaintiffs "knew" of the injury to M.G. when Ms. Gregg became aware that M.G. had brain injury–and not at the time that plaintiffs knew the "extent of injuries suffered by M.G." (Doc. 176-4 ¶ 7).

          a.    <u>Ms. Gregg's Testimony</u>

First, the Court will examine the deposition testimony of Ms. Gregg[4]. In her deposition, Ms. Gregg was questioned about what she knew about M.G.'s injury and when. The testimony reads:

Q:    When did you learn anything more than what your mother told you about M.G.'s condition?

**A:**    **There was a nurse who said she would send the doctors in and they tried to explain what had happened when they came in.**

Q:    And what did they explain?

**A:**    **That I had a uterine rupture and that M.G. was without oxygen and that they were shipping him to Johns Hopkins because they were better equipped to deal with his condition.**

Q:    And did they tell you what his condition was, did they place a name on it?

**A:**    **No, they–**

Q:    Just that he was without oxygen?

**A:**    **Right.**

---

[4] In plaintiffs' Response to the United States' Renewed Motion to Dismiss [Docs. 123, 124], plaintiffs argued the United States misrepresented the testimony of Ms. Gregg. ([Doc. 124] at 10). This Court has since reviewed the entire transcript of the deposition and finds that the testimony was properly characterized.

([Doc. 124-7] p.108:9-108:21).  Thus, it is clear from the deposition testimony of Ms. Gregg that she knew she suffered a uterine rupture which left M.G. without oxygen, and that due to the lack of oxygen he had to be sent to Johns Hopkins just after birth.  Plaintiffs posit that this simply shows that Ms. Gregg knew M.G. was without oxygen, but not that he suffered any "injury".

Ms. Gregg was later questioned, however, regarding a suggestion by her pediatrician that she take M.G. to see a neurologist.  The medical records of Dr. Andrew Berens, state that he first suggested to Ms. Gregg that she take M.G. to see a neurologist on November 28, 2000; that Ms. Gregg was going to follow up with a Pediatric Neurologist; and that he discussed with Ms. Gregg the "possibilities of neurological complications" and that "[s]he is aware of it."  ([Doc. 102-3] p. 46).  When asked about this notation, Ms. Gregg confirmed that the note was accurate.

Q:     Do you know, did Dr. Berens tell you why he suggested you see a neurologist?

**A:     Not that I can recall.**

Q:     Did you ask him why you should see a neurologist?

**A:     He-he was delayed, he was in the Birth To Three Program[5] already and-**

Q:     So when did you know he was delayed?

**A:     (No Response).**

Q:     Did you know that at the time when Dr. Berens told you to see a neurologist?

**A:     I believe so.**

---

[5]  Ms. Gregg testified that the Birth to Three Program "provided occupational, physical and speech therapies for [M.G]."  ([Doc. 176-6] p. 46).

([Doc. 124-7] p. 115-116).

Further, when discussing Ms. Gregg's consideration of putting M.G. up for adoption, Ms. Gregg noted that she "asked about special needs children and placement and [she] didn't get answers that [she] liked." She decided not to pursue adoption because "the probability of [M.G.] being adopted into a nice home were not very likely." ([Doc. 176-6] at 98). Later in the deposition she elaborated:

Q:   Okay. You had testified earlier theat you had considered adoption when [M.G.] was a couple months old.

**A:   Correct.**

Q:   Do you remember what prompted that specifically?

**A:   The– he cried, like I was saying, he– he cried a lot, every day. There were days he and I cried each other to sleep. It was rough.**

Q:   What was your understanding of the reason for these delays and problems he had?

**A:   The lack of oxygen.**

Q:   At birth?

**A:   Yes.**

Q:   And what was your understanding of why there was a lack of oxygen?

**A:   The uterine rupture.**

([Doc. 176-6] at 117-118).[6] Based on the deposition testimony of Ms. Gregg, therefore, it

---

[6]   Plaintiffs take issue with an interpretation that Ms. Gregg knew her son was injured–instead arguing that the testimony only speaks to "crying" which is not an injury. The Court finds this interpretation lacks merit.

is apparent that she knew M.G. suffered a lack of oxygen at birth, that he had delays and problems which she termed "special needs," and that he needed occupational, physical and speech therapies from just after birth.

       b.    <u>M.G.'s Medical Records</u>

Second, the Court will look to the medical records of M.G.  There are consistent notations throughout M.G.'s medical records of neurological issues.

M.G. was born on November 14, 2000 and taken to Johns Hopkins Hospital for evaluation.  ([Doc. 173] at 1). On November 25, 2000, M.G. was discharged to the care of Ms. Gregg.  (Id.)  M.G.'s discharge summary instructed: "Follow neurological status." ([Doc. 176] at 7000A-7002A).

Following the discharge of M.G. from Johns Hopkins Hospital, M.G. was taken into the care of pediatrician Andrew Berens, M.D.  ([Doc. 173] at 2).  On or about November 28, 2000, M.G. was first seen by Dr. Berens, who noted:

> Child is at notable risk for feto-anoxic brain injury, and although no further seizures seen, there does appear to be some clonic-type activity, very subtle in quality.  **Apparently is going to follow up with pediatric neurologist at Johns Hopkins in 1-2 months.  After that point, we'll probably refer him to pediatric neurology in Martinsburg. Discussed with mom the possibilities of development of neurological complications.  She's aware of it.**  Advised that some of these conditions may not show up until his development progresses, but needs to be watching for further recurrence of neonatal seizure activity....  We'll follow this closely, once a week.  Call me if there is any change.

([Doc. 176] at 7003A) (emphasis added).  On or about December 21, 2000, Dr. Berens

noted: "Perinatal seizures without recurrence but **suspected hypoxic brain injury**." (Id. at 7004A) (emphasis added).

On or about December 16, 2000, Ms. Gregg filled out a "Specialty Care Intake Form." On the form Ms. Gregg states: "**Needs to see Pediatric Neurologist due to lack of oxygen at birth. (Brain damage)**." ([Doc. 102-4]) (emphasis added).

On April 19, 2001, when M.G. was five months old, an "Occupational Therapy Initial Evaluation" was performed by Occupational Therapist Leslie Bowman. ([Doc. 176] at 7008A). The evaluation states:

> Currently, [M.G.] is functioning at the following levels:
>
> Fine Motor
>
> Visual tracking          Age appropriate
>
> Grasp/ Prehension          **2-3 months**
>
> Reach          **2-4 months**
>
> Release          **0-2 months**
>
> Bilateral skills          **1-3.5 months**
>
> ...
>
> Areas to Address
>
> 1.     Parent education.
>
> 2.     **Developmental delay.**
>
> 3.     Reflux type behaviors.

(Id. at 7009A-7010A) (emphasis added). Following this evaluation, on or about May 11, 2001, Dr. Berens noted "**Developmental delay- continuing referral to Dr. Ingold, in pediatric neurology.** Concerned about effused anterior fontanelle at his stage." (Id. at 7012A) (emphasis added).

On July 17, 2001, when M.G. was 8 months old, M.G. was evaluated by Monique K. Gingold, M.D. to determine if he needed to enter a special needs program. ([Doc. 173]

at 3; [Doc. 176] at 7015A-7018A).  The evaluation states in part:

> In summary, this young man, with a very complicated neonatal course, is doing extremely well.  I am very impressed by the fact that his head circumference is normal and he no longer has the cortical thumbing.  **He is still significantly delayed and on the Denver Developmental Assessment, is at around six months throughout.**  Nevertheless, this does represent a significant improvement from the last visit.  And as I explained to the mother, it is impossible totally to predict what he will be doing...

(Id. at 7017A) (emphasis added).  The nursing notes from this visit state: "**Mom states he has brain damage that was caused from the delivery.**"   (Id. at 7016A) (emphasis added).  Additionally, the notes of the social worker state: "Patient here for **developmental delay evaluation.  There was problems [sic] at delivery with the child, and the child had brain damage, as indicated by the mother.**"  (Id. at 7017A) (emphasis added).

On or about September 6, 2001, Dr. Margret Jaynes, pediatric neurologist, evaluated M.G. per a referral of Dr. Berens.  ([176] at 7020A, 7021A-7023A).  She states in her letter to Dr. Berens: "**It does appear that [M.G.] has suffered some neurological insult, although further investigation is required in order to properly characterize it.** We would like to request that you send copies of his records, both from your office as well as any you have from Johns Hopkins to us in the pediatric neurology clinic."  (Id. at 7023A) (emphasis added).   On September 26, 2001, Dr. Berens noted: "**Apparent learning disability with prenatal brain damage.**  Seeing Dr. Jaynes....  Possible learning disability with history of perinatal brain damage- continue to follow with Dr. Jaynes, pediatric neurology.  Apparently she feels that his deficits may be mild as he grows."  (Id. at 7019A,

7020A (noting referral for perinatal brain damage)) (emphasis added).

Most of the above cited records indicate that Ms. Gregg was aware of the issues with M.G., and many indicate that she was the individual providing the healthcare provider with the information that M.G. suffered brain damage due to a lack of oxygen at birth. These notations, while not dispositive of Ms. Gregg's knowledge of M.G.'s injury, support the finding based on her deposition testimony that Ms. Gregg was aware, prior to September 14, 2004, that M.G. had neurological problems resulting from the lack of oxygen at birth caused by the uterine rupture.

c.      The Expert Reports

The Court has been presented with the testimony and/or reports of three doctors in the above-styled case. The Government has submitted a letter and the deposition testimony of Dr. Clancy. [Docs. 109-1; 176-11]. Plaintiffs submitted affidavits by Dr. Epstein and Dr. Barakos. [Docs. 176-4, 176-5]. The Court finds, however, that all three doctors support this Court's finding that M.G. was injured at birth, and that plaintiffs knew or should have known of that injury prior to September 14, 2002.

First, the Court will address the testimony of Dr. Clancy. The Government submitted a letter from Dr. Clancy who evaluated the case based on M.G's medical records. ([Doc. 109-1] at 1). In the initial Motion to Dismiss [Doc. 31], there was much discussion of *Muenstermann by Muenstermann v. United States*, 787 F.Supp. 499 (D.Md. 1992). Specifically, this Court found that additional discovery was needed in order to determine if M.G.'s injury was knowable at birth or–if like the plaintiff in *Muenstermann*–such a diagnosis was not available at birth. Dr. Clancy discussed the differences between the

*Muenstermann* case and the case at bar[7]. ([Doc. 109-1]). He notes that while the birth records of the plaintiff in *Muenstermann* showed the plaintiff to be "neurologically normal at birth," with evidence of a stroke only being discovered when a CT scan was performed at nine months due to plaintiff's cognitive difficulties. (Id. at 1). He compared this to the records in the case at bar where M.G's "brain injury was known and treated at birth." (Id.) Dr. Clancy's conclusion was that "throughout [M.G.'s] early infancy, there were clear and unequivocal neurologic and developmental signs demonstrating that his brain injury was still present and persistent. He had clearly developed cerebral palsy which was in evidence long before his second birthday." (Id. at 4-5)[8].

Plaintiffs submitted affidavits of two doctors, Dr. Epstein and Dr. Barakos, in support of the opposition to the motion to dismiss. [Docs. 176-4, 176-5]. The Court notes that the affidavits submitted by plaintiffs' experts use the words "manifest" and "manifested" with regard to M.G.'s injury. (See e.g. [Doc. 176-4] ¶ 25; [Doc. 176-5] ¶ 23). This terminology–although artful–does not subsume the substance of the affidavit which is that: Ms. Gregg was told to follow the neurological status of M.G. ([176-4] ¶ 4); she took M.G. to neurological consolations ([Doc. 176-4 ¶ 8); and that "[o]n July 17, of 2001 an evaluation

---

[7]   The Court notes that plaintiffs take issue with Dr. Clancy opining as to the differences in the two cases, but as Dr. Clancy provided a medical opinion in both *Muenstermann* case and in the case at bar, and states the _factual_–and not the _legal_–differences in the cases, this Court finds his opinion to be proper.

[8]   In the letter, Dr. Clancy cites to specific language M.G.'s medical records supporting his conclusions which the Court finds no need to reiterate here. Additionally, the Court notes that plaintiffs deposed Dr. Clancy which the Court considered, but found unremarkable.

noted that [M.G.] was significantly delayed." ([Doc. 176-4] ¶10). The affidavits stress Ms. Gregg's possible lack of knowledge as to any "predict[ion]" "prognosis" or "diagnosis" but do not dispute that she knew M.G. had an injury. (See e.g. [Doc. 176-4] ¶¶ 7, 9, 10, 11, 15, 16, 20). Further, the Court notes plaintiffs' experts state in their affidavits that there was a documented manifestation of the brain injury in September of 2001 as to motor function. ([Doc. 176-4] ¶ 11).

The doctors concluded that: "[o]ther than the advice to watch and wait for the possible manifestations of brain injury as M.G.'s development progressed, there is no documented evidence in the medical record that anyone told Sharon Gregg that her child had manifested a brain injury." ([Doc. 176-4] ¶ 25). Further, they concluded that "[t]he first indication of the manifestation of *any* injury is July 2001, and before this it was *unknown, to a reasonable degree of medical certainty, how any brain injury would manifest if at all.*" (Id.) (emphasis in original). The doctors also opined: "[w]hile it may have been known around the age of six months that M.G. had suffered some effect of the hypoxic-ischemic event, at six months of age it was *unknown, to within a reasonable degree of medical certainty, how the injury would manifest in M.G.*" (Id.) (emphasis in original). The last of these conclusions, that at six months an "injury" was known, but its effects were "unknown, to within a reasonable degree of medical certainty" is directly in line with the conclusion of Dr. Clancy that "throughout [M.G.'s] early infancy, there were clear and unequivocal neurologic and developmental signs demonstrating that his brain injury was still present and persistent." ([Doc. 109-1] at 4-5).

Based on the forgoing reasoning, this Court finds that plaintiffs knew or should have known of M.G.'s injury prior to September 14, 2002.

## 2.    Knowledge of the Cause of the Injury

Next, the Court must address when plaintiffs knew or should have known the cause of M.G.'s injury.  *See  **United States v. Kubrick***, 44 U.S. 111, 123 (1979).  In ***Kerstetter v. United States***, 57 F.3d 362 (4th Cir. 1995), the Fourth Circuit addressed the meaning of "cause" for purposes of the FTCA.  The plaintiffs brought suit on behalf of their daughter, and on their own behalf, after their daughter suffered kidney failure following surgery. Plaintiffs argued that their claim did not accrue at the time of the surgery, but only when they were later informed that the renal failure was due to damaged blood vessels which served her kidney.  The Court rejected this argument, stating:

> This is not, as might first appear, a factual dispute regarding when the Kerstetter's actually knew the cause of Elizabeth's injury and whether, if they did not know the cause until September 1990, they exercised due diligence. Rather, this issue boils down to a pure question of law: what does "cause" mean for purposes of the FTCA. The Kerstetters' argument is premised on their construction of the word to refer to the *precise medical reason* for the injury.  In contrast, the Government and the district court read the term at a greater level of generality-one that would require, in this case, only knowledge that *the operation* caused the injury.
>
> The Supreme Court's decision in ***Kubrick*** clearly reveals that the government's interpretation is the correct one. The plaintiff in that case suffered hearing loss approximately six weeks after being treated for a leg infection at a Veterans' Administration (VA) Hospital. In January 1969, some nine months after his treatment, Kubrick learned that his hearing loss probably was caused by the VA doctors' administration of the antibiotic neomycin. Not until June 1971, however, did he learn that the administration of neomycin likely constituted negligence. Kubrick filed suit under the FTCA in late 1972, more than two years after having learned the probable cause of

27

his injury but less than two years after discovering that the doctors might have been guilty of malpractice. ***Kubrick*** thus presented the question whether a claim can "accrue" under the FTCA before the plaintiff becomes aware (or reasonably should have become aware) that his injury was negligently inflicted. The Court answered in the affirmative, explaining that it was

> unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. *The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury.* He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to the minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

444 U.S. at 122, 100 S.Ct. at 359 (emphasis added).

By this very same reasoning, it should not make a difference when the plaintiff learns just what went wrong during a medical operation. So long as the plaintiff knows "the critical fact" of "who has inflicted the injury," he can act to protect his rights by inquiring whether the injury was inflicted negligently. If he comes to suspect that it was, then he can file suit even before he discovers the precise medical cause of the operation's failure. After all, it might not be until discovery that he gains a satisfactory appreciation of the immediate cause of his injury.

***Kerstetter***, 57 F.3d at 364 - 365 (emphasis in original).

Based on testimony of Ms. Gregg, she knew M.G.'s injuries were the result of the

lack of oxygen at birth which was caused by the uterine rupture.

> Q: What was your understanding of the reason for these delays and
> problems he had?
>
> **A: The lack of oxygen.**
>
> Q: At birth?
>
> **A: Yes.**
>
> Q: And what was your understanding of why there was a lack of oxygen?
>
> **A: The uterine rupture.**

([Doc. 176-6] at 117-118).   Accordingly, plaintiffs knew "the critical fact" of "who ha[d] inflicted the injury," and could have "acted to protect [M.G.'s] rights by inquiring whether the injury was inflicted negligently."  **Kerstetter**, 57 F.3d at 364 - 365.

Additionally, any argument that plaintiffs did not know the "cause" of the injury until plaintiffs knew the uterine rupture was "doctor caused" is likewise unavailing based on the law in this Circuit.  In **Gould**, the Fourth Circuit stated: "[t]he burden is on the plaintiffs to show that due diligence was exercised and that critical information, reasonable investigation notwithstanding, was undiscoverable."  905 F.2d at 745-46.   Plaintiffs have previously argued that Ms. Gregg did not have the required information to know the "cause" of the injury to M.G. until she obtained the medical records and fetal monitoring strips[9] from M.G.'s birth. [Doc. 49].  While plaintiffs did not obtain the medical records until October of 2002, and the fetal monitoring strips until February of 2003, that information was not necessary for plaintiffs to know the *cause* of injury.  As discussed above, "[u]nder federal

---

[9]  Fetal Monitoring strips are used to monitor the baby's heartbeat during labor.

law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." ***Nasim v. Warden, Maryland House of Correction***, 64 F.3d 951, 955 (4th Cir. 1995) (citing ***Kubrick***, 444 U.S. at 123). Ms. Gregg knew at the time M.G. was born that he suffered a lack of oxygen and that the lack of oxygen was caused by the uterine rupture. Thus, when Ms. Gregg knew of the injury (M.G.'s developmental delays and problems) she was placed on inquiry notice as to whether the injury was negligently inflicted. *See **Muenstermann,*** 787 F.Supp. 499 (D.Md. 1992) (finding cause of action accrued when parents of plaintiff became aware after CT scan that infant suffered a stroke during labor and where doctors found infant to be neurologically normal at birth).

Further, any failure of Ms. Gregg to inquire as to whether the uterine rupture was negligently inflicted does not toll the running of the statute of limitations. ***Kerstetter***, 57 F.3d at 364 - 365; see ***Herrera-Diaz***, 845 F.2d 1534, 1537 (9th Cir. 1988) (finding that mother knew or should have known of cause of infant's cerebral palsy where mother knew it was caused by a lack of oxygen at birth but "did not inquire as to what had caused the lack of oxygen" because "[s]he thought that [the infant] was 'just born like that because that's the way God wanted it.'"); ***Gordon v. United States***, 1992 WL 144697 *1, *2 (9th Cir. June 2, 1992) (finding that FTCA claim was barred by statute of limitations where parents knew more than two years before filing suit that child was "developmentally delayed and that the case was stress at birth"); ***Blair v. United States***, 2009 WL 1294061 *1, *5 (N.D.N.Y. May 7, 2009) (finding on motion for summary judgment that plaintiff did not know as a matter of law about cause of injury where the record provided "virtually no indication that medical personnel actually informed [plaintiff's guardians] that [plaintiff's

developmental delays were the result of a brain injury, or that this injury was caused by the manner of [plaintiff's] delivery" and where law provided that plaintiffs must know of "doctor related cause"); *see also **Johnson v. United States***, 2005 WL 1605822 *1, *10 (W.D. Tex. June 30, 2005) (assuming *arguendo* that mother of infant with cerebral palsy did not know of cause of the infant's injury and finding mother should have made inquiries where she knew of problems occurring during and just after birth including fact that child was not breathing at birth); **Rice v. United States**, 889 F.Supp. 1466, (N.D.Okla. 1995) (denying summary judgment for the Government based on a material issue of fact as to knowledge of cause where mother of plaintiff knew child aspirated or swallowed meconium at birth, but relied on comments by medical personnel that child was "born with" the problem believing the doctors meant the problem was hereditary).

Based on the foregoing, this Court finds that plaintiffs' claim accrued, for purposes of the FTCA statute of limitations, prior to September 14, 2002. As such, plaintiffs' claim is barred–and this Court lacks jurisdiction to hear plaintiffs' claim–unless equitable tolling is applicable.

### D.    Equitable Tolling

Plaintiffs urge this Court to find that equitable tolling applies to save plaintiffs' cause of action. ([Doc. 173] at 30) (citing **Irwin v. Dep't of Veteran Affairs**, 498 U.S. at 93-96; **Gould**, 905 F.2d at 745). In **Irwin**, a plaintiff brought suit against the government alleging employment discrimination. The Supreme Court found that equitable tolling did not apply, but stated that equitable tolling would be allowed in limited situations where either "the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant had been induced or tricked by his adversary's

misconduct into allowing the filing deadline to pass." 498 U.S. at 96. Plaintiffs do not argue that *Irwin* applies due to filing a "defective pleading during the statutory period"[10] but argue equitable tolling should apply because plaintiffs were "induced or tricked" into allowing the filing deadline to pass. The applicability of equitable tolling in any FTCA case has, however, been brought into question by the Supreme Court's holding in *John R. Sand and Gravel Co. v. United States*, 552 U.S. 130 (2008).

    1.    <u>Is Equitable Tolling Available in Light of *John R. Sand and Gravel Co.*</u>?

In *John R. Sand and Gravel Co.*, the Supreme Court considered a statute of limitations which governs suits against the United States in the Court of Federal Claims. The Court therein distinguished *Irwin*, noting that in that case the Court "found equitable tolling applicable to a statute of limitations governing employment discrimination claims against the government." *John R. Sand and Gravel Co.*, 552 U.S. at 137. The Court then distinguished *Irwin* from cases where the statute of limitations "seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as facilitating the administration of claims." *Id.* at 133.

The question for this Court, therefore, is whether the FTCA falls into the category of statutes of limitations which "seek primarily to protect defendants against stale or unduly delayed claims" or those which "seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as facilitating the administration of claims." *Id.* at 133. The cases the Supreme Court cites to in *John R.*

---

    [10] As discussed above, plaintiff's state court filing is not subject to the savings provision of 28 U.S.C. § 2679(d)(5)

***Sand and Gravel Co.***, seem only to muddle the question.

For the proposition that "[m]ost statutes of limitations seek primarily to protect defendants against stale or unduly delayed claims" the Court cites as an example ***Kubrick***, 444 U.S. 117. ***Kubrick*** is an FTCA case, which would imply that the Court is finding that FTCA cases fall into the category of those which "seek primarily to protect defendants against stale or unduly delayed claims." ***Kubrick*** is, however, a case where the Court did not find tolling–and the pinpoint cite is to a section of the opinion where the Court addresses the general history of statute of limitations, and distinguishes the FTCA from other statutes of limitations noting, "[w]e should also have in mind that the Act waives the immunity of the United States and that in construing the statute of limitations, which is a condition of that waiver, we should not take it upon ourselves to extend the waiver beyond that which Congress intended." ***Id.*** at 117-118 (citing ***Soriano v. United States***, 352 U.S. 270, 276 (1957)); *but see* ***John R. Sand and Gravel Co.***, 552 U.S. 140 (J. Stevens, dissent, arguing ***Irwin*** explicitly overruled ***Soriano***).

For those statutes of limitations which "seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as facilitating the administration of claims," ***John R. Sand and Gravel Co.***, 552 at 133, the Court cites: ***United States v. Brockamp***, 519 U.S. 347, 352-353 (1997), and ***United States v. Dalm***, 494 U.S. 596, 609-610 (1990), "limiting the scope of a governmental waiver of sovereign immunity" ***Id.*** at 133. ***Brockamp*** states:

> The nature and potential magnitude of the administrative problem suggest that Congress decided to pay the price of occasional unfairness in individual cases (penalizing a taxpayer

whose claim is unavoidably delayed) in order to maintain a
more workable tax enforcement system. At the least it tells us
that Congress would likely have wanted to decide explicitly
whether, or just where and when, to expand the statute's
limitations periods, rather than delegate to the courts a
generalized power to do so wherever a court concludes that
equity so requires.... [necessitating a finding that the] larger
congressional objective [is]: providing the Government with
strong statutory "protection against stale demands."

*Id.* at 352-53. Additionally, *Dalm* states: "[h]aving failed to comply with the statutory

requirements for seeking a refund, [plaintiff] asks us to go beyond the authority Congress

has given us in permitting suits against the Government. If any principle is central to our

understanding of sovereign immunity, it is that the power to consent to such suits is

reserved to Congress." *Dalm*, 494 U.S. at 609-610.

Thus, this Court is left with citations to an FTCA case for the proposition that

equitable tolling should apply where the statute of limitations "seek primarily to protect

defendants against stale or unduly delayed claims" and citations to cases finding that it is

for Congress alone to determine when statute of limitations should be tolled in the case of

sovereign immunity. This Court finds that equitable tolling is likely not available in FTCA

cases, because "[i]f any principle is central to our understanding of sovereign immunity, it

is that the power to consent to such suits is reserved to Congress," *Dalm*, 494 U.S. at 610,

and noting that Congress has provided for some tolling in the savings provision of 28

U.S.C. § 2679(d)(5). See *Brockamp*, 519 U.S. at 352-353 (noting "the explicit listing of

exceptions, taken together, indicate to us that Congress did not intend courts to read other

unmentioned, open-ended, 'equitable' exceptions into the statute that it wrote.") Finding

it to be possible, however, that the Congressional intent in FTCA cases is to allow for equitable tolling, this Court will consider the issue.

       2.     <u>Assuming Equitable Tolling is Available, Is it Available to Plaintiffs?</u>

The equitable tolling provision from ***Irwin*** upon which plaintiffs rely is: "the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." 498 U.S. at 96. In support of this argument, plaintiffs cite to the fact that when initiating the state court suit, plaintiffs' counsel contacted counsel for Shenandoah Community Health Center ("Shenandoah"), Curtis Power III, and was informed that the notice of claim letters required by West Virginia state law were properly served on the Executive Director of Shenandoah. ([Doc. 173] at 31-32). Plaintiffs further argue that Mr. Power then delayed in responding to the state claim "to induce a stay of the case and to intentionally delay so that the Plaintiffs' statute of limitations would run in July of 2003." (Id. at 33). This argument is absurd for several reasons.

       a.     <u>If Administrative Claim Was Filed Within 60 Days of Dismissal of State Court Action, Plaintiffs' Claim Would Have Been Saved Pursuant to 28 U.S.C. § 2679(d)(5)</u>

First, should counsel have filed an administrative claim within 60 days of the dismissal of the claim filed on March 23, 2003, the administrative claim would relate back pursuant to 28 U.S.C. § 2679(d)(5). Thus, no matter what delay–or what information conveyed or not conveyed by Mr. Power–plaintiffs' claim would have been filed within two years of July 2001 which plaintiffs' experts agree was the 'first' manifestation of any injury to plaintiff. (*See* III(C)(1)(c), *supra*). An argument that puts the blame onto the Government for what is at best a failure of counsel to file within the statutory time frame is poorly received by this Court. As the Court noted in ***Irwin***, equitable tolling does not apply

to a "garden variety claim of excusable neglect." 498 U.S. 96.

### b. Standard Documented Procedure Was Followed

Second, as the Government notes in its brief, the procedure outlined in the Bureau of Primary Health Care ("BPHC") Policy Information Notice ("PIN"), 99-08, requires that requisite information be received and reviewed prior to determining that a claim is covered by the FTCA. ([Doc. 150-3], Section XIX). Plaintiffs' argument, therefore, relies on the fact that the BPHC PIN 99-08 results in intentionally misleading plaintiffs into serving the wrong parties. This argument is without merit. Plaintiffs were notified after counsel determined that the claim fell within the coverage of the FTCA, that the employees were deemed employees for purposes of the action. ([Doc. 173] at 32; Power Depo. [Doc. 185-6] 24: 16-25, 25:1-3, 14-18 (noting that counsel for plaintiffs never inquired whether Shenandoah was a federally deemed entity and stating that had plaintiffs inquired that information would have been disclosed). It is equally possible, however, that after reviewing the information required by PIN 99-08, there would have been a determination that the claim was not covered by the FTCA.

### c. The Statute of Limitations Is Not Tolled Where Plaintiffs Failed to Diligently Inquire As to Status of Treating Physicians

Further, it is plaintiffs' burden under **Gould** to determine whether a defendant healthcare provider is employed by the government. 905 F.2d 738. Plaintiffs' failure to do so can hardly be termed an 'inducement' or 'trick' on the part of the Government, and does not toll the statute of limitations. *See Irwin*, 498 U.S. at 96; (Power Depo. [Doc. 185-6] 24: 16-25, 25:1-3 (noting that counsel for plaintiffs never inquired whether Shenandoah was

36

a federally deemed entity and stating that had plaintiffs inquired that information would have been disclosed)).

In **Gould**, a widow alleged that medical malpractice had been committed by Government physicians who were working at a private hospital. The Court, while recognizing that equitable tolling would be available under appropriate circumstances, failed to apply it to this action where the widow was not aware of the legal identity of the doctors as federal employees until months after the statute of limitations had run: "[t]he Government is under no obligation to notify every prospective plaintiff of its identity and involvement through its employees in all potential legal actions." **Gould**, 905 F.2d at 745. Courts have routinely declined to recognize the existence of any such obligation on behalf of the United States with regard to federally employed physicians.

In **T.L. Ex. Rel. Ingram v. United States**, 443 F.3d 956 (8th Cir. 2006), the Eighth Circuit Court of Appeals addressed a factual scenario remarkably similar to the case at bar. In **Ingram**, a mother brought suit alleging medical malpractice at the birth of her daughter who suffered a brain injury which eventually resulted in cerebral palsy. The mother was unaware that the physician was an employee of a federally funded clinic and thus argued that equitable tolling should apply. The plaintiff argued that she could not reasonably have known that the doctor in question was employed by a federally funded clinic and that the statute of limitations should toll on that basis. In response thereto, the Eighth Circuit quoted language from the Supreme Court in **Irwin** stating: "The doctrine of equitable tolling applies to FTCA claims against the Government, but does not apply to 'garden variety' claims of excusable neglect, **Irwin**, 498 U.S. at 96, 111 S.Ct. 453, and should be invoked only in exceptional circumstances." **Ingram v. U.S.**, 443 F.3d at 963. The Eighth Circuit

thus refused to toll the two year statute of limitations contained within the Federal Tort Claims Act just because the plaintiff was unaware of the status of a particular defendant physician as a federal employee acting in the scope of his employment.  "A plaintiff thus must inquire into the employment status of her doctor." *Ingram*, 443 F.3d at 964.

Likewise, the First Circuit Court of Appeals undertook an analysis of this issue in *Gonzalez v. U.S.*, 284 F.3d 281 (1st Cir. 2002) wherein the Court held that the plaintiff had demonstrated a lack of due diligence in failing to determine that the doctors who attended the birth of her baby were federal employees in that there was no evidence presented that either the plaintiff or her attorneys made any inquiry whatsoever as to their status. *Gonzalez*, 284 F.3d at 291-92. The First Circuit stated therein: "Although the plaintiff did not know the federal status of the defendant at the time of her treatment, she and her attorneys had two years to ascertain the legal status of the doctors and could easily have learned it.  Instead, they simply assumed that this was a state case and failed to make any inquiries whatsoever to confirm their assumption. This demonstrates a clear lack of due diligence on the part of the plaintiff and her attorneys". *Gonzalez*, 284 F.3d at 291-292. 956, 961 (8th Cir. 2006).  The Ninth Circuit Court of Appeals has also rejected the argument that knowledge of a tort feasor's federal employment is necessary before the statute of limitations contained within the FTCA begins to run. *Hensley v. United States*, 531 F.3d 1052, 1058 (9th Cir. 2008), *cert denied*, 129 S.Ct. 2432 (May 26, 2009).

In *Whittlesey v. Cole*, 142 F.3d 340 (6th Cir. 1998), (6th Cir.1998), the Sixth Circuit Court of Appeals, when considering whether to toll a statute of limitations based upon the fact that the plaintiff was unaware that the defendant doctor was a private actor rather than an employee of the Government at a military hospital found that "Plaintiff was armed with

sufficient information to engage in an investigation of his claim which would have included a determination of the employment status of the treating physician." ***Whittlesey***, 142F.3d at 343. The Sixth Circuit credited the Fourth Circuit precedent in ***Gould*** for the proposition that: "Whittlesey's argument that the statute should not begin to run until discovery of the legal status of the tort feasor would obviate the necessity of due diligence, even when the injury and its cause are known and a minimum inquiry would have led plaintiffs to discover in a timely manner the employment status of the treating physicians. This approach would remove incentives for the timely investigation and prompt presentation of claims... the very purpose of the statute of limitations". ***Id.*** at 343. The Eighth Circuit Court of Appeals likewise relied upon Fourth Circuit precedent in ***Gould*** when finding that the statute of limitations applicable to FTCA claims does not wait until such time as a plaintiff is aware that the alleged tort-feasor is an employee of the federal government: "Where the Government and its agents have not misled or deceived a plaintiff, or otherwise hidden the legal identity of alleged tort feasors as federal employees, the cause of action still accrues when the existence of an injury and its cause are known." ***Garza v. U.S. Bureau of Prisons***, 284 F.3d at 930, 935 (8th cir. 2002).

Further, this Court finds that the Fourth Circuit's finding in ***Gould*** remains the law after ***Irwin***. In ***Gayle v. United Parcels Service, Inc.***, 401 F.3d 222, 227 (4th Cir. 2005), the Fourth Circuit cited the Supreme Court decision in ***Irwin*** in finding that an employee was not entitled to equitable tolling as to an appeal from the denial of benefits pursuant to ERISA. Citing the ***Irwin*** Court's pronouncement that equitable tolling would not apply to a "garden variety claim of excusable neglect", the Fourth Circuit stated: "The law has always, and necessarily, held the people responsible for innocent mistakes. The tort

system, for example, is premised on penalizing innocent yet negligent mistakes". ***Gayle v. United Parcels Service, Inc.***, 401 F.3d 222, 227 (4th Cir. 2005). The Fourth Circuit went on to characterize mistakes made by attorneys:

> Many attorney mistakes are innocent in that they involve oversights or miscalculations attributable in some part to the sheer press of business. To accept such mistakes as a ground for equitable tolling, however, would over time consign filing deadlines and limitations periods to advisory status. The ensuing confusion would contradict our prior observation that equitable tolling requires 'extraordinary circumstance beyond [the plaintiff's] control that prevent him from complying with the statutory time limit.

***Gayle***, 401 F.3d at 227.

d. <u>Information Regarding the Deemed Status of Shenandoah Was Available to Plaintiffs</u>

The Public Health Service Act ("PHSA"), was amended by the Federally Supported Health Centers Assistance Act of 1995, 42 U.S.C. § 201 et. seq. The FSHCAA was first enacted in 1992 and made permanent in 1995 and now applies to over 920 Health Centers throughout the fifty states and their statutory qualified providers. The law which created the federal support for Community Health Care Centers was easily accessible to plaintiffs' counsel in 2002, having been enacted through legislation sponsored by Senator Edward Kennedy in 1966 and enhanced by FSHCAA in 1992. The FSHCAA which was legislatively enacted in 1992, was clearly established by the 2000 to 2003 time frame.

There has never been a requirement that the Government provide notice of federal employees' status. Plaintiffs' counsel could have asked for information about the Health Center status from the Health Center staff, or the Health Resources and Service

Administration's ("HRSA"), Bureau of Primary Health Care. As previously addressed, BPHC PIN99-08 gives notice of the policy necessary once a deemed Community Health Center is notified of an action against it.

Employees of Shenandoah also could have provided information regarding their coverage under the FTCA if any inquiry had been made. The fact that a Health Practitioner is not required to maintain medical malpractice insurance when employed by a Community Health Center such as Shenandoah is an incentive for seeking employment at the Center. The depositions of H. Alexander Wanger, M.D., and Lori Goforth, CNM took place in this action on October 13, 2009. Both were asked of their knowledge as to the FTCA:

Q:      Were you aware of an association with the U.S. Government.

**A:      Yes.**

Q:      And what did you understand that association to be?

**A:      One, insurance was provided by the Federal Tort System and that we received funds.**

Q:      Did you have to pay out of your own pocket any kind of ...

**A:      No.**

Q:       ...insurance coverage?

**A:      No.**

(Wanger Depo., [Doc. 150-5] p. 8-9.) Likewise, Nurse Midwife Goforth testified that she was aware that Shenandoah was a federally funded Community Health Center[11]. (Goforth

---

[11] Plaintiffs' counsel also inquired of Dr. Wanger and Nurse Midwife Goforth whether Shenandoah advertises in any manner its connection to the Federal Government. However, neither the Government, the Health Center nor the practitioners who are deemed as Public

Depo., [Doc. 150-6] p. 25-26).

Plaintiffs' counsel is charged with knowing the law. The fact that Ms. Gregg was treated at a Community Health Center such as Shenandoah should have put counsel on notice that a federal connection might exist. Moreover, mere inquiry of a Shenandoah employee would have elicited the required information as demonstrated by the depositions

———————————————

Health Service employees have a duty to disclose a deemed Health Center's federal legal status. Congress did not require federally supported Health Centers and their employees to provide notice that they have been deemed eligible for FTCA coverage. There is no Government regulation or policy issuance that establishes such a duty. No such issue has been addressed by Congress as Congress has not imposed such a duty upon Health Centers deemed by operation of FSHCAA, 42 U.S.C. § 233(g)-(n).

The intention of Congress not to require federally supported Community Health Centers to provide notice of their legal status under the FTCA to patients is further proven by the fact that Congress did require such an obligation with regard to Free Clinics or their volunteer Health Care Practitioners. 42 U.S.C. § 233(o)(2)(E) provides as follows: "Before the service is provided, the Health Care Practitioner or the Free Clinic provides written notice to the individual of the extent to which the legal liability of the Health Care Practitioner is limited pursuant to this subsection...". In contrast, Section 233(g) contains no comparable language requiring such notice be given by federally supported Health Centers or Community Health Centers or their employees. Where Congress "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." ***Russello v. United States***, 464 U.S. 16, 23 (1983). The deliberate decision by Congress to include statutory language requiring those entities and employees covered by Section 233(o) to provide written notice of their legal status, while not mandating the same disclosure of entities and employees covered by Section 233(g), demonstrates that it was not the intention of Congress to impose a notice requirement for Community Health Care Centers and their employees.

of Dr. Wanger and Nurse Midwife Goforth.  Thus, this Court finds that the Government never hid information regarding the deemed status of Shenandoah and plaintiffs are not entitled to equitable tolling on that ground.

## CONCLUSION

Based on the foregoing reasoning, the Court **ORDERS** that the United States' Renewed Motion to Dismiss for Lack of Jurisdiction [Doc. 101] should be **GRANTED**, and the above-styled case be **DISMISSED** from the active docket of this Court for a lack of jurisdiction.

It is so **ORDERED.**

The Clerk is hereby directed to transmit copies of this Order to counsel of record herein.

**DATED:** January 7, 2010

JOHN PRESTON BAILEY
CHIEF UNITED STATES DISTRICT JUDGE